## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WYSAN R. LONGSTREET,

    Plaintiff,

    v.                                                                    Civil Action No.:  SAG-20-1317

C.O. THOMAS CUTSHALL,

    Defendant.

### MEMORANDUM

In response to this civil rights complaint, defendant Thomas Cutshall[1] filed a motion to dismiss or, in the alternative, motion for summary judgment.  ECF 14.  Plaintiff Wysan Longstreet opposes the motion.  ECF 17.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons stated below, defendant's motion, construed as one for summary judgment, shall be granted.

### BACKGROUND

**I.      Complaint Allegations**

Wysan Longstreet is an inmate committed to the custody of the Maryland Division of Correction and confined in Roxbury Correctional Institution ("RCI") at all times relevant to this case.  Longstreet claims that on June 2, 2017, between the hours of 3:30 a.m. and 4:30 a.m., Correctional Officer Thomas Cutshall approached him and poked him in the right buttock while telling him to move his "ass before [he] fuck[s] it up for everyone else."  ECF 1 at 4.  At the time Longstreet was working in the RCI Inmate Dining Room.  *Id.*

---

[1]    The Clerk will be directed to correct the spelling of defendant's name.

Longstreet states that Cutshall's actions were done in plain view of the security cameras in the dining room and in full view of Lt. Xavier.[2]  ECF 1 at 4.  Immediately following the interaction with Cutshall, Longstreet approached Xavier to discuss Cutshall's behavior and to ask him to order Cutshall to refrain from touching Longstreet in that manner again.  *Id*.

On June 17, 2017, between the hours of 3:30 a.m. and 4:30 a.m., Longstreet claims that he was speaking with another inmate, Aaron McNamara, and Cutshall approached the two inmates to tell Longstreet to stop running his mouth and "go shake [his] ass."  ECF 1 at 4.  He states this interaction was also in full view of the security cameras in the dining room.  *Id*.

According to Longstreet, Cutshall continued to harass him during his shifts in June of 2017, by ordering him to return to his assigned housing unit.  ECF 1 at 4.  He further claims that Cutshall attempted to get Longstreet fired by lying to his boss, Mr. Schenck.  *Id*. at 4-5.

After Longstreet complained about Cutshall's treatment in an administrative remedy procedure complaint ("ARP"), he filed a complaint pursuant to PREA[3] and an investigation was conducted by the Internal Investigation Division ("IID").  ECF 1 at 5.  Detective Sergeant Kandace Mills was assigned to conduct the IID investigation and, according to Longstreet, she said she was friends with Cutshall.  *Id*.  Longstreet recalls that Mills told him his claims against Cutshall did not fit his characteristics.  *Id*.

Following his interview with Mills, Longstreet states he was told he could not return to work in the kitchen until the PREA investigation was completed.  He recalls being told that he would still be receiving payment for working and would still earn diminution of confinement credits for holding a job ("industrial credits").  ECF 1 at 5.  During this time, Longstreet had to "walk through the breakfast meal line with the inmate population."  *Id*.  He claims that each time

---

[2]        Xavier appears to have served for a short while as an acting Lieutenant.  ECF 14-4 at 6.
[3]        Prison Rape Elimination Act, Pub. L. No. 108-79, 117 Stat. 972 (2003).

he walked through the breakfast line, Cutshall would verbally harass him by calling him "PREA boy." *Id*. Longstreet wrote to Lt. Cutter about the harassment and called the PREA hotline to notify Detective Mills about Cutshall's actions. *Id*.

Longstreet states that six weeks later, Cutshall started coming to Longstreet's cell during the 12 a.m. to 8 a.m. shift for purposes of harassing Longstreet. ECF 1 at 6. Longstreet claims that Cutshall would have the officer in the housing unit open Longstreet's cell door and Cutshall would step inside the cell to threaten him. *Id*. These threats included a statement that Cutshall has a brother who works at North Branch Correctional Institution ("NBCI") and that Cutshall could have Longstreet transferred there where Cutshall's brother would "fuck [him] up every day [he] was there." *Id*. Longstreet also recalled that Cutshall told him he has a German shepherd that Cutshall had trained to "bite holes in niggers" and if he was allowed to bring the dog into the prison, he would have the dog "chew the black off [Longstreet's] ass." *Id*.

Longstreet recalls that on the "first two times" Cutshall came into his cell, he was awakened from sleep, but the other times he was awake as he was unable to sleep after the first two times Cutshall came into his cell. ECF 1 at 6. Longstreet explains that his interactions with Cutshall were particularly disturbing for him because he was molested by a "friend" of his mother's when he was six years old. *Id*. He states that his abuser would molest him while he slept on a pullout couch and that his abuser would threaten harm to Longstreet's mother and siblings if he told anyone. *Id*. He states that when Cutshall poked him and later threatened him, "it caused my unresolved childhood abuse to resurface months later." *Id*. The triggering of his childhood trauma, according to Longstreet, required alteration of his psychological medication and caused a long-term issue with insomnia. *Id*.

Longstreet states he wants "someone" to view the video footage mentioned in his June 25, 2017 ARP because it will support his claim that Cutshall assaulted and harassed him. ECF 1 at 7.

He also seeks to have Cutshall reprimanded for assaulting him; and for someone to verify that Cutshall has a German shepherd and a brother who works at NBCI. *Id*. at 8. Longstreet also wants someone to verify that he called the PREA hotline in June and July of 2017 which would establish he called numerous times. *Id*. He seeks unspecified financial compensation and to have criminal charges filed against Cutshall. *Id*. Longstreet also seeks production of the IID file memorializing Mills's investigation into his claim and "for someone to research the Washington County, Maryland IID records to see how many PREA claims have been filed" against Cutshall. *Id*. at 8-9.

## II.    **Defendant's Response**

Cutshall maintains that he never touched Longstreet in the manner described. ECF 14-3 at 2, ¶ 7 (Decl. of Thomas Cutshall). Cutshall explains that his recollection of Longstreet is that he is a "troublemaker" because "he does not readily acknowledge and obey verbal commands when they are issued." *Id*. at 1, ¶ 3. Rather, Longstreet "often requires multiple warnings in order to get him to obey and adhere to a given order." *Id*. This is the type of incident that occurred on June 2, 2017.

Cutshall recalls that on June 2, 2017, Longstreet caused a delay in the chow line because he was "engaging in banter" with other inmates. ECF 14-3 at 1, ¶ 4. Cutshall gave Longstreet "several verbal warnings to curtail his conversations" but Longstreet did not alter his behavior or respond to the warnings. *Id*. at 2, ¶ 5. In light of Longstreet ignoring his warnings, Cutshall used the antennae at the end of his "DPSCS-issued radio" to nudge Longstreet's right arm near his elbow, signaling that he needed to end his conversations with other inmates. *Id*. at ¶ 6. Cutshall also denies sexually assaulting Longstreet during this or any other encounter, including during pat-down searches. *Id*. at ¶¶ 8-10. Further, Cutshall denies harassing or threatening Longstreet. *Id*. at ¶¶ 11-12.

The IID investigation report, conducted and prepared by Detective Sergeant Kandace Mills, included an interview of Longstreet, Cutshall, Xavier, Inmate Aaron McNamara, and Inmate Brian Hodge. ECF 14-4. Mills interviewed Longstreet at RCI on July 31, 2017. *Id*. at 3. During the interview Longstreet maintained that Cutshall poked him in the right buttock with his finger and said, "move your ass before you fuck it up for everyone." *Id*. Longstreet added that Cutshall had a habit of grabbing inmates' genitals when searching them and that the inmates referred to him as "Ball Jingles." *Id*. Longstreet said that an inmate named Brian could confirm this but could not provide the inmate's last name.[4] *Id*. Longstreet also claimed that Cutshall plays sexual games with the inmates and that Xavier was present when Cutshall poked him with his finger. *Id*.

Longstreet also told Mills that Cutshall told him on another day to "go shake your ass" and that he took that to mean he should "go strip, go shake your ass." ECF 14-4 at 3. Longstreet said that an inmate by the name of McNamara was present during this encounter but could not provide Mills with McNamara's first name. *Id*. Longstreet added that Cutshall runs the chow line and frequently makes jokes when he grabs inmates' genitals. *Id*. at 4. Longstreet said other inmates are afraid to say anything about him due to fears he will retaliate. *Id*.

Mills located inmate Aaron McNamara who had been transferred to Brockbridge Correctional Facility and subsequently released to a drug treatment program. ECF 14-4 at 5. On May 30, 2018, Mills spoke with McNamara by phone. *Id*. McNamara related that he had never had a problem with Cutshall but confirmed that he had worked with Longstreet with whom he would occasionally talk. *Id*. at 5-6. McNamara told Mills that he never worked at 3 or 4 in the morning at RCI; rather, he worked the evening shift between 3:30 p.m. and 6:00 p.m. *Id*. at 6. McNamara explained that Longstreet used to work the evening shift but "then went to midnight

---

[4]       Longstreet later told Mills that Brian's last name was Walter but when Mills researched that name, she found that Longstreet was never housed at RCI with an inmate named Brian Walter or Walters. ECF 14-4 at 6.

shift after he made a complaint against the female officer." *Id*. The information provided by McNamara conflicts with Longstreet's allegation in his ARP that Cutshall always harasses McNamara. *Id*.

On June 7, 2018, Mills interviewed Cutshall at the IID Western Office. ECF 14-4 at 6. When she showed Cutshall a photo of Longstreet, Cutshall recognized him as an inmate who used to work in food service. *Id*. Cutshall denied ever having a problem with Longstreet, denied grabbing Longstreet's genitals during frisk searches, denied poking Longstreet on his buttock, and denied making inappropriate comments during frisk searches. *Id*. at 7. Cutshall explained that he does thorough frisk searches but never uses an open hand to "grab inmate's testicles." *Id*. Cutshall maintained that Longstreet liked to "pass stuff" to other inmates and liked to talk to other inmates when he was supposed to be working. *Id*. Cutshall did recall poking Longstreet on the back of his arm with his radio antennae and telling him to move during the meal line when Longstreet was supposed to be working. *Id*.

When asked why Longstreet might have made such allegations against him, Cutshall said he didn't know but thought it might be because he does thorough searches on inmates. ECF 14-4 at 7. Cutshall said he had never heard inmates calling him "Ball Jingles" but that they have called him "the fruit Nazi" because he only allows them to take what they are allowed to have out of the dining room. *Id*. Cutshall recommended that Mills talk to Inmate Hodge because he had worked in food service at RCI since Cutshall had been stationed there. *Id*.

On June 14, 2018, Mills spoke with Sgt. Joshua Xavier. ECF 14-4 at 7. Xavier described Cutshall as "not easy going" and said that he follows the rules. *Id*. at 8. Xavier stated he was fine with the way Cutshall did his job. *Id*. When asked if he recalled the incident on June 2, 2017, Xavier stated that Cutshall was having a problem with the way Longstreet was doing his job because he was not supposed to talk to other inmates while they were eating and Cutshall told him

to stop.  *Id*.  Xavier recalled that Longstreet approached him and reported that Cutshall was harassing him, but that Longstreet did not elaborate on how Cutshall was harassing him.  *Id*.

Xavier then recalled that Longstreet had come to him "another time" and said that Cutshall had "poked him."  ECF 14-4 at 8.  Xavier maintained that Longstreet did not elaborate beyond that report and when Xavier spoke with Cutshall about it, Cutshall denied poking Longstreet.  *Id*.  Xavier added that, "Inmates are not big fans of Cutshall because he doesn't let them have what they're not supposed to have."  *Id*. at 9.

Mills interviewed Brian Hodge, an inmate at RCI who works in food service.  ECF 14-4 at 9.  Hodge related that he has known Cutshall for approximately three years and described him as "professional."  *Id*.  Hodge explained that Cutshall "don't let nothing go past him;" that he gets "upset when other officers let stuff go past them;" and that "[e]verything he does is going to be by the book."  *Id*.  According to Hodge, Cutshall conducts thorough searches and that some inmates complain that Cutshall grabs their genitals but "there are some officers that don't go between the legs" and that Cutshall "does it the way it's supposed to be done."  *Id*.  Hodge related that he had been searched by Cutshall about 100 times in a year and that "everyone else avoids him but I go to him."  *Id*.

Hodge recognized a picture of Longstreet and recalled that Longstreet told him that he was "going to get Cutshall because they were in an argument."  ECF 14-4 at 9.  Hodge claimed he told Longstreet he was not going to lie for him.  *Id*.  According to Hodge, Longstreet said he was going to call the PREA hotline and say that Cutshall did something to him and when Longstreet asked him if he had his back, Hodge told him no.  *Id*. at 10.  Hodge added that "[t]hose guys don't like Cutshall because he does his job.  I'm not lying for that man."  *Id*.

Mills closed the investigation after finding no evidence to substantiate the claims made by Longstreet.  ECF 14-4 at 11.

### III.    Opposition Response

Longstreet maintains that there is video footage of the June 2, 2017 incident which should be in the IID file along with statements from other inmates who witnessed the encounter.  ECF 17 at 5.  He explains that Mills interviewed him a second time more than one year after his first interview because he continued to make phone calls to the PREA hotline.  When she interviewed him the second time, she indicated that she did not have a copy of his ARP showing the date and time of the incident.  *Id*. at 4.  Mills's report indicates that Longstreet gave her the incorrect date during his first interview, and she reviewed video footage from June 17, 2017 instead of June 2, 2017.  ECF 14-4 at 4-5.  Mills inquired about viewing the June 2, 2017 video and was told there would be a search for it, but there is nothing else in her report regarding the video.  *Id*.  Longstreet maintains that he asked for a copy of the IID file and believes he was denied a copy because the video surveillance for June 2, 2017 is not in the file.  ECF 17 at 4.

**STANDARD OF REVIEW**

Defendant relies on exhibits attached to his motion.  Because the court will consider defendant's exhibits, the Court must convert the motion to dismiss to a motion for summary judgment.  "[N]o formal notice of conversion by the district court is required in cases where it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion—for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion."  *Carter v. Balt. Cty.*, *Maryland,* 39 F. App'x 930, 933 (4th Cir. 2002) (per curiam).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without

8

weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002).  Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Id*. (quoting Fed. R. Civ. P. 56(e)).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 249-50.

## ANALAYSIS

### I.    Eighth Amendment - Sexual Assault

"Section 1983 itself creates no rights," but rather "provides a method for vindicating federal rights elsewhere conferred."  *Kendall v. City of Chesapeake*, 174 F.3d 437, 440 (4th Cir. 1999) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)); *accord Doe v. Broderick*, 225 F.3d 440, 447 (4th Cir. 2000).  "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). Here, Congress intended with the enactment of the PREA "[t]o provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and to provide

information, resources, recommendations, and funding to protect individuals from prison rape." PREA, Pub. L. No. 108-79, 117 Stat. 972 (2003).  Nothing in the PREA suggests that Congress intended to create a private right of action for prisoners to sue for non-compliance.  *See Williams v. Dovey*, No. DKC-15-1891, 2016 WL 810707, at *7 (D. Md. Mar. 2, 2016) (citing cases).

Notwithstanding the absence of an independent cause of action under PREA, permitting the gratuitous sexual assault of inmates is not an acceptable practice under the Eighth Amendment's prohibition of cruel and unusual punishment.  To establish an Eighth Amendment claim, there must be evidence that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation.  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  "Although prisoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards, *see Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000), the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment."  *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004).

"[T]here can be no doubt that severe or repetitive sexual abuse of an inmate by a prison office can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation."  *Boddie v. Schnieder*, 105 F.3d 857, 861 (2nd Cir. 1997) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Sexual abuse of an inmate by a prison official has no legitimate law enforcement or penological purpose and those actions alone may meet the subjective element of an Eighth Amendment claim.  *See id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). However, when the claim alleges incidents that are not "severe enough to be 'objectively, sufficiently serious'" and "the incidents [are not] cumulatively egregious in the harm they inflicted" no Eighth Amendment claim is stated.  *Boddie*, 105 F.3d at 861 (citing *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)).  Here, Longstreet's claim of one isolated incident

involving an offensive touching falls far short of the egregious type of harm prohibited by the Eighth Amendment.  Accepting his allegation as true, Longstreet's claim does not satisfy either the objective or subjective elements of an Eighth Amendment claim entitling Cutshall to summary judgment in his favor.

## II.    Harassment

Verbal abuse of inmates by guards, without more, states no claim of assault.  *See Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219, n.3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).  However, a threat of harm combined with action apparently designed to carry out the threat may state Eighth Amendment claim.  *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978).  It also may state a claim of denial of access to courts if threats were intended to intimidate inmate from exercising that right.  *Id.*; *see also Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977).  "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996).  Harassment together with a bread and water diet and the arbitrary use of tear gas states a claim of cruel and unusual punishment.  *Sweet v. S.C. Dep't of Corrs.*, 529 F.2d 854 (4th Cir. 1975); *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972); *Landman v. Royster*, 354 F. Supp. 1302 (E.D. Va. 1973).

To make out a retaliation claim under § 1983, a showing of adversity is essential.  *ACLU of Maryland, Inc. v. Wicomico Cty., Md.*, 999 F. 2d 780, 785 (4th Cir. 1993) (citation omitted).  "The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Mt. Healthy City Sch. Dist.*

*Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  The inmate must allege facts sufficient to show that the alleged act of retaliation had a chilling effect on his exercise of the right of access to the courts.  *ACLU of Maryland,* 999 F.2d at 784.  The retaliatory actions must be likely to deter "'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2006) (quoting *Washington v. Cnty. Of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (Sotomayor, J.)).

Cutshall does not directly deny Longstreet's allegations that he came into his cell to threaten him with a transfer to NBCI where his brother works and with comments about his German shepherd.  Rather, Cutshall takes the position that the allegation does not state a claim.  Longstreet's complaint is unverified and his opposition response does not include a declaration,[5] nor did he include those allegations in his ARPs or in the statement of charges he filed with the Washington County Maryland District Court.  Further, Longstreet does not allege that the threats he claims Cutshall delivered were of such a serious nature that he abandoned an otherwise meritorious claim against Cutshall.  Longstreet provides evidence to the contrary: he pursued his PREA report vigorously through repeated phone calls to the hotline and attempted to file criminal charges[6] against Cutshall.  ECF 17-1 at 4-8.  To the extent the alleged threats were made, and there is no objective evidence establishing that they were, Longstreet was not intimidated into forfeiting any of his perceived avenues for relief.  Accordingly, this claim shall be dismissed.

---

[5]      As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like respond to the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Kipps v. Ewell*, 53 F.2d 564, 566 (4th Cir. 1976).  A verified complaint, however, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.  *Davis v. Zahradnick*, 600 F.2d 458, 459-60 (4th Cir. 1979).  Longstreet has provided neither.

[6]      Criminal charges against Cutshall were declined by the Commissioner on April 10, 2019 due to a lack of probable cause.  ECF 17-1 at 6.

**CONCLUSION**

For the reasons stated herein, the motion to dismiss or for summary judgment filed on behalf of defendant Cutshall shall be granted in a separate order which follows.


February 17, 2021                                    _____/s/_____
Date                                                            Stephanie A. Gallagher
                                                                    United States District Judge